MEMORANDUM OF DECISION
Naomi L. was born in Hartford on February 25, 1976. The mother of the child is Connie L., d/o/b July 17, 1957; the father is Raymond A., whose current whereabouts are unknown.
The pending petition was filed by the child's guardian ad litem on March 12, 1992; it alleges that Naomi L. is an uncared for child, within the intent and meaning of General Statutes Section 46b-120, in that the child's home cannot provide for her specialized needs. More specifically, the guardian ad litem has alleged that Naomi L. "has significant emotional problems complicated by diabetes for which she neglects to take her insulin."
NOTICE AND JURISDICTION
The return of service indicates that respondent/mother received service of the petition at her usual place of abode. With respect to respondent/father, the court, on petitioner's motion, ordered notice by publication in the Hartford Courant. The confirming affidavit filed by the newspaper, with an attached clipped legal advertisement, indicates that constructive notice by publication was afforded respondent/father in compliance with the court's order of notice. CT Page 1797
The court finds that notice was provided in accordance with the requirements of law and that this court has jurisdiction.
FINDINGS OF FACT
The evidence presented at trial, as well as a review of the documentation contained in the official court file, established the following facts. Naomi L. has a significant history of acting out behavior, which might reasonably be characterized as "defiant" conduct. In her immediate family, there are two younger siblings: Corey L., d/o/b March 1978, and Tiffany L., d/o/b July 11, 1980.
Prior to 1990, Naomi's behavior was appropriate and, apparently, perfectly acceptable. In mid-1989, Connie L. married Mr. F. In June of 1990, Naomi disclosed to authorities that she had been sexually abused by Mr. F. and his son. It is reported that respondent/mother did not believe the child's allegations, was unsupportive of Naomi, and felt that the child had fabricated the details of the incident.[2] Following 1990, there were numerous disagreements and difficulties between mother and child; there were reported incidents of the child having been put out of the home, of her running away for protracted periods, and of problematical school attendance. Through DCF involvement, she was placed on four occasions, during 1991, in emergency shelters; during that period, Naomi also spent time in the CAPS program and the ABC Unit at Mr. Sinai Hospital. In late 1991, a FWSN petition was filed in this Court, at the request of respondent/mother, on the basis that the child was out of control. It was alleged that Naomi constantly ran away from her home and refused to comply with medical treatment necessary for the control of her diabetic condition.[3] Thereafter, FWSN orders entered, the child did not comply, and a delinquency petition was filed on the basis of violation(s) of court orders; subsequently, Naomi L. was remanded to detention under the pending delinquency petition. On or about March 11, 1992, the child, on the delinquency disposition, was discharged "without further court accountability," and the instant uncared for petition (which had been prepared on 3/2/92) was filed the next day (3/12/92) by the guardian ad litem.
Prior to the filing of the petition, Naomi L., in May CT Page 1798 1991, was examined by Dr. Harvey Glass, a clinical psychologist; at the time, Naomi was a resident of the Youth Emergency Shelter of the Salvation Army, and the purpose of the evaluation was to assist DCF in formulating treatment and placement planning for the child. Dr. Glass noted that the youngster was diabetic and was required to self-inject insulin; he further noted that there were no reports of prior psychotherapy, that Naomi appeared adequately rested and nourished, and that she was "appropriate" to the examination. Dr. Glass stated that the child functioned in the average range of intelligence, and that she did not appear to have any depression or "other significant disturbance of affect." Dr. Glass concluded:
 "Even if this youngster is a handful in terms of her social adjustment, the psychological tests are not evidencing serious psychopathology . . . The girl is apprehensive, mildly anxious, perhaps a little despondent — but there is not much evidence for significant disturbance of affect or significant thought disorder."
On the September, 1991 admission to the Mt. Sinai CAPS unit, Naomi was evaluated as having average academic skills without any particular learning disability, and it was observed that the youngster demonstrated "a strong desire to succeed in school." It was further observed that the child had been unable to reside with her mother because of "severe oppositionality." At that time, it was stated that Naomi had been particularly noncompliant with respect to maintaining her diet and in the taking of insulin as medically prescribed. It was indicated that Naomi tended to be impulsive, that she often acted without fully weighing the consequences of her actions, and that her impulsivity was partly to blame for her erratic insulin compliance. Naomi was viewed as encountering difficulty in admitting to herself that she needed the help of others to address her existing problems, that she is resistive to any such assistance from others, and that given her condition of insulin dependent diabetes, this conception that she is independently invincible places her at risk for serious physical consequences. The clinical psychiatrists viewed Naomi's main strength as her intelligence, and noted that she professed to love school, stating that she would like to pursue her education beyond the high school level. CT Page 1799
In November 1991, Naomi was admitted to Mt. Sinai's ABC Unit, again with dangerous blood sugar levels; subsequently, the child was discharged to her mother's care, with an after-care worker initiating intensive interventions to maintain the child in the home, and with DCF directing referrals to a number of residential facilities. Residential placement became, in time, quite complicated due to the requirement of such facilities that assurance be furnished, through a medical expert, that Naomi could effectively manage her diabetes through compliance with the prescribed medication regimen.[4]
Subsequently, the child not having remained in the home, there were placements in emergency shelters, she was admitted (through Department efforts) to the Job Corps., she was hospitalized for not properly attending to her diabetic condition, and thereafter, Naomi was the subject of several foster placements. On December 15, 1992, it was reported to the court that respondent/mother had petitioned the Probate Court for a commitment of her daughter due to her neglect of the diabetic condition.[5] On that date, the court granted the motion for an OTC (child suffering from a serious physical illness) and ordered DCYS to find an appropriate placement for Naomi immediately, unless she was committed that day by the Probate Court.[6] At the request of DCF, the court also ordered a psychiatric evaluation to be performed by Dr. Richard B. Sadler, as well as an immediate, full physical examination of the child.
Under the authority of the OTC, the child was to be appropriately placed by DCF, undergo the necessary medical and psychiatric assessments, and cooperate in preliminary arrangements and interviews regarding a possible placement at Cumberland Hospital, located in Virginia. In early January 1993, DCF moved this court to vacate the OTC on the basis that the youth was entirely uncooperative with the Department; it was stated that Naomi had left the foster home she had chosen and was, at that time, whereabouts unknown. The Department's request to vacate the OTC was not acted upon (by agreement), the child re-entered a care facility after a brief hospitalization at Mt. Sinai, and thereafter was placed in another foster home. The child left the home after a few days, remained some time with friends, and was then placed in still another foster home. Naomi was referred to a Life Skills Course and, through a service agreement, it was understood the child would be placed in independent living CT Page 1800 upon her successful completion of the course, her remaining stable, and her having established a pattern of regular school attendance. With respect to schooling, Naomi was to be referred by the Board of Education to the Synergy Program, an alternative educational modality which would enable the youth to complete high school in a timely manner.[7]
In the following months, problems regarding this youth continued and/or escalated. Foster parents asked for her removal, she lived briefly in the Salvation Army shelter, and resided with (as well as cared for) an elderly aunt. Naomi began receiving independent living funds from DCYS in March, 1993. The youth did not pay the bills as agreed, she often had insufficient monies for food, Synergy reported excessive absenteeism, and, at one point, she left the residence of the elderly aunt and was later located in Pennsylvania. On another date, Naomi left the elderly aunt without care, having been picked up at the aunt's house by some person at 4:00 A.M., and thereafter, having missed school.[8] Additional excessive absenteeism from the Synergy Program was reported to DCF as of May 1993, and the youth was residing again in a shelter while awaiting an opening at the Allison Gill Lodge (a facility preparatory for independent living); however, it was confirmed through PIRG, a citizens action group, that Naomi, as of 5/17/93, had secured full-time employment. Extraordinary difficulties developed while the child remained in residence at the shelter; at some point she returned home and promptly ran away, and, by early Summer 1993, she was residing with a friend in Hartford. Around that time, the youth was advised by DCF that the agency would be denying her the independent living program based on lack of cooperation with placements and school; Naomi was notified, however, that Job Corps might reconsider her for readmission to that program which would provide services without State intervention or continuation of the OTC. On or about June 1, 1993, DCF reported that the youth's mother had reiterated her willingness to provide a home for Naomi, that the mother was, in fact, able to provide a suitable home, that every reasonable effort had been made by DCF on behalf of Naomi, and that the youth had maintained herself medically over a period of several months and was no longer a danger to herself.
In mid-August 1993, an agreement was reached whereby Naomi L. would be placed in a Norwich foster home, which home was considered to constitute a minimally supervised setting, CT Page 1801 and, at the end of a three months period, if things went well, she would be admitted to the Independent Living program administered by DCF. Under the terms of the August service agreement, the youth was free to request an alternate placement if residing in Norwich proved unsatisfactory, she was required to attend to her own needs (medical, and otherwise), and she was permitted to travel by bus to the Hartford area on weekends; the purpose of the service agreement was to provide Naomi with the opportunity to demonstrate an ability to conduct herself in a responsible manner, over a relatively brief period of time, in a minimally supervised setting. Within a matter of days, the Norwich foster parent requested that Naomi L. be removed from the home because of numerous difficulties which had erupted, almost immediately, including threatening conduct on the part of this youth toward other children within the foster family. Naomi was returned to her mother's home and was advised by DCYS that in view of her violation of the service agreement, another placement would not be secured for her; thereafter, in September 1993, the Department was informed that the youth was again neglecting her diabetes regimen and had been treated at the hospital on two separate occasions.
In his initial psychiatric evaluation, dated January 1993, Dr. Sadler described Naomi L. as "an averagely intelligent, socially aware, at times highly motivated, but traumatized and stubborn adolescent." Dr. Sadler confirmed that medical documentation indicated that Naomi had developed diabetes mellitus which was diagnosed around 1989 and, that in the initial stages, the child had not encountered significant difficulties with the management of the disease. The psychiatrist also confirmed that Naomi demonstrated, through psychological testing, a strong motivation towards academic success. With regard to the diabetic condition, Dr. Sadler stated further:
 "While Naomi is frequently noted to mismanage or inadequately attend to her diabetic diet and insulin administration, there have been significant environmental factors which have further stressed her in this regard. Her mother is noted by clinicians to have handicapped Naomi at times in her management of her diabetes. In spite of this, Naomi has to some degree appropriately addressed these issues by seeking medical care when needed even if in an abrupt or "crisis" situation rather CT Page 1802 than by steadily maintaining her medical attention. However, Naomi has not caused herself to enter a diabetic coma or to have experienced the more severe forms of physical or neurological impairments as the result of serious out of control diabetic management Naomi has not been found to be acutely suicidal by psychiatric personnel."
The psychiatrist observed that this youth's resistance to ongoing treatment and needed psychotherapeutic intervention had been demonstrated over past years by the number of failed attempts to secure appropriate treatment.
In Dr. Sadler's initial evaluation, he indicated that minimal benefit, if any, would be gained by undertaking to "coerce" Naomi L. into treatment; rather, the psychiatrist considered it more helpful to the youth to continue to offer and recommend services felt to be potentially of assistance to her, hoping that her intelligence, and her motivation for self-improvement, would render her more stable in terms of interpersonal interactions and more accepting of adult support. Dr. Sadler stated:
 "While it is certainly acknowledged that Naomi remains at risk of impulsive acting out, which potentially could be of significant harm to her . . . this is not felt to be of an extent that more forceful interventions would be recommended at this time . . .
 "She has experienced massive traumas in the past and she has not been able to find support within her own household and has not been able to establish sufficiently stable connections with other help giving adults in order to sufficiently stabilize her life in order to resume her development and academic progress. Naomi is a child at high risk yet with significant potential and strength to draw upon . . .
 "Continued [DCF] supervision and support is seen as a potential adjunct to the multifaceted care needed by Naomi, yet no clinician sees the need for, or usefulness of, attempting to enforce treatment recommendations by [DCF], but rather the Department could be used as a support and resource for Naomi and CT Page 1803 as an additional source of monitoring her for the potential of interventions in the future as Naomi will permit them to be provided for her."
With regard to the later psychiatric evaluation of March 7, 1993 (child interviewed on 3/4/93), Dr. Sadler again reviewed all clinical reports made available on Naomi L. He observed that the youth is "vulnerable and . . . has been forced to make independent decisions and to care for herself in an independent manner before her years and experience would prepare her for such a difficult task." With respect to independent living, the psychiatrist stated (3/7/93):
 "I have serious doubts as to Naomi's ability to independently care for herself, yet I do not see indications that this is a dangerous proposition for her. Alternative plans have . . . more serious drawbacks than the risks inherent in Naomi attempting to live on her own."
Consistent with his earlier evaluation, Dr. Sadler concluded that this youth was in need of significant support, but that intervention should not be forced upon her:
 "Naomi could benefit from continued support and encouragement from [DCF]. I continue to see little advantage, and potentially serious disadvantages, of attempting to compel Naomi to enter programs in which she does not voluntarily agree to participate. It remains to be seen whether Naomi is capable of maintaining an independent, even if supported, living arrangement, yet this appears to be a trial that is necessary for Naomi. Any support that can be lent to her by [DCF] or other supportive agencies would be to Naomi's advantage in order to maximize her potential for success in this endeavor."[9]
The psychiatrist also expressed the view that "[o]ngoing individual psychotherapy and perhaps a group with other adolescents' having similar concerns would serve to benefit Naomi.
In his testimony, Dr. Sadler repeated much of what is contained in his evaluation (3/7/93) report. He described CT Page 1804 Naomi as having a very difficult behavioral history, many runaways from home, mismanagement of her diabetes, and several hospitalizations. The psychiatrist reiterated that he still did not believe it would be beneficial to Naomi to attempt coercing or forcing her into placement against her will; he again reported that he did not find Naomi to be depressed or suicidal. With respect to having Naomi reside in her mother's home, Dr. Sadler testified that in his opinion, the youth "had not conducted herself in a stable manner and her behavioral and emotional difficulties were aggravated while she was living at home with her mother"; the psychiatrist stated that Naomi "demonstrated abilities — functional abilities — that were more stable, more in her best interests, when out of her mother's care." Dr. Sadler testified that he felt the mother's home was not adequate to meet Naomi's needs. With regard to DCF support and intervention, the psychiatrist testified:
 "My opinion was that it would be clinically helpful to have [DCF] state supervision, support, and interventions. I, specifically, recommend that the State not try to determine or dictate Naomi's care. I felt that it would be counter-productive. She was a fragile and brittle adolescent whom I felt would benefit from support, who wished to pursue reasonable goals and would require some support and guidance . . . in order to achieve them. But, they were within her grasp. I didn't believe she would be able to do that independently and that the State would be of benefit to her. Past attempts to more forcefully intervene and, specifically, prescribe for Naomi had not been successful . . so I recommended that interventions which had not been successful in the past, not be repeated."
In such regard, Dr. Sadler testified that in his opinion, helping Naomi would require flexible responses, and responses which "could be tailored to the situation as it evolved."[10]
However, the evaluator stated he "would recommend structure", and a "degree of control, judiciously applied."[11] With respect to independent living, and the necessity and/or advisability of a commitment, Dr. Sadler expressed his position, as follows: CT Page 1805
 "It is exceedingly difficult for an adolescent to support themselves and to live independently. Naomi has the additional burdens of emotional disorders, which at times impair her judgment and lead her to take courses of action which are not, in my judgment, in her best interest. She has an exceedingly difficult tasks of supporting herself, of managing her own day to day affairs, much less progressing for the future and growing and developing into an adult. Any support that could be given to her, I think would be a good idea. I don't know what she would accept . . . it would greatly facilitate her development and growth into adulthood to have some guidance, support, encouragement and physical support. Where that comes from, I don't believe is crucial. [DCF] is one resource that I believe could facilitate Naomi's development."[12]
The DCF history with Naomi L. has been one of a multitude of failed placements and dismissals from various educational and training programs. She has not, and will not, remain in her mother's home for any extended period. DCF has worked endlessly and tirelessly with this youth; the OTC was dissolved on 10/5/93 because of Naomi's failure to cooperate with the Department and, but for the pendency of this petition, DCF would have closed its file. Since September 1993, however, the youth did maintain some contact with her social worker, Ms. D'Appollonio. More recently, Naomi has lived with a family in Hartford, at their sufferance, paying no rent and having no means of support.[13] DCF wishes to close the agency file because Naomi has been non-compliant; Ms. D'Appollonio feels that a sensible plan would be admission to Camp Weiker, which Naomi, recognizing that it is, perhaps, her last opportunity, has expressed the wish to pursue. The youth can attend Camp Weiker, whether committed or not, but would be required to follow all rules and to take her medication as prescribed. If she completed the program, Naomi could obtain a GED and, in time, attend Eastern.[14] If committed before her eighteenth birthday, support and other voluntary training or educational services, including possible readmission into the IL program, would be available, through DCF, to age twenty-one.[15]
Respondent/mother maintains that Naomi may live in her home where, she asserts, the child's needs can be adequately attended to in the family setting; since around August 1989, however, there has been no serious consideration given to CT Page 1806 Naomi's returning to her mother's home. Both the youth's mother and DCF oppose commitment on the primary basis that Naomi L. has been, and will continue to be, substantially, if not entirely, uncooperative and oppositional. Both counsel for the youth and the petitioning guardian ad litem urge commitment in order to establish eligibility for DCF educational support and voluntary services, particularly with a view toward independent living training and preparation, to age twenty-one.
ADJUDICATION
The court hereby finds that petitioner (guardian ad litem) has proved by a fair preponderance of the evidence, that Naomi L. is an uncared for child in that her home cannot provide for her specialized needs. cf. General Statutes Section 46b-120. It is the court's view that the evidence fairly established that Naomi L.'s emotional instability exceeds mere adolescent, oppositional behavior, and is of sufficient consequence that the youth could benefit from a volitional program of psychotherapy, if she would accede to same. In terms of the youth's physical condition, Naomi is afflicted with the disease of diabetes mellitus, which was diagnosed in 1989, and which condition the child has, on repeated occasions, seriously neglected. The evidence detailing the unfortunate history of this case establishes, quite clearly, that Naomi L. and her mother are unable to reside compatibly in the same household; such circumstance has impacted negatively on the youth's emotional and physical conditions as is evidenced, so decidedly, by the repeated runaways and the youth's inattention to her necessary medical regimen. Therefore, on the court's assessment of the evidence, the youth's physical, mental, and emotional needs cannot be met in the parent's home.
The court hereby finds, applying a fair preponderance of the evidence standard, that Naomi L., is an uncared for child, in that her mother's home cannot provide the specialized care which her physical, emotional, or mental condition requires. The said Naomi L. is hereby adjudicated an uncared for/specialized needs child, within the intent and meaning of Connecticut General Statutes Section 46b-120. CT Page 1807
DISPOSITION
It is petitioner's position that Naomi L. should be committed to DCF prior to her eighteenth birthday in order that she would qualify for voluntary educational services, including IL training and assistance, to her twenty-first birthday. The Department and respondent/mother argue, cogently and with considerable merit, that little, if anything, will be gained by a commitment since the youth has not in the past, and most probably will not in the future, cooperate with the agency, accept services offered, or follow through with suitable and/or beneficial program(s). Unquestionably, this position of DCF and Connie L., advanced so persuasively by each of their respective attorneys, finds considerable substantiation in this adolescent's rather dismal record of working and cooperating with concerned and extraordinarily understanding agency workers. However, I cannot overlook that Naomi L. is an exceedingly troubled youngster, who in addition to having severe emotional and developmental difficulties, is also afflicted with a serious physical illness. Nor can I overlook the fact that Naomi's emotional and behavioral problems, giving rise, on occasion, to incorrigibility, developed, and first became manifest, after 1990; that is, following the victimization and exploitation of this child by adults. Additionally, I accept, and cannot overlook, the opinion of the court designated psychiatric evaluator, Dr. Sadler; as stated heretofore, the psychiatrist observed that Naomi L. has "additional burdens of emotional disorders," at times impairing her judgment, and leading her to courses of action adverse to her best interests; the evaluator testified: "[a]ny support that could be given . . . would be a good idea . . . it would greatly facilitate [Naomi's] development and growth into adulthood . . . [DCF] is one resource that I believe could facilitate Naomi's development."
The evaluators have all consistently noted that this youngster's principal strength derives from her intelligence level and her continued expression of wishing to pursue laudable goals, particularly in terms of advancing her education. The court, on the evidence, agrees with counsel for this child that the mother's home simply is not a viable option; the young woman is in need of professional support and guidance, if she will accept same, with a view towards the volitional provision of appropriate training for independent living. The extent to which such professional assistance can be provided depends, of course, in large extent, on the degree CT Page 1808 of cooperation received from Naomi, especially in terms of furthering her education; however, the commitment of the youth to DCF, at this point, will put in place the vehicle whereby voluntary educational and training services may be provided, through DCF auspices, to age twenty-one, if the young woman is willing to work with the Department in undertaking to achieve her educational and independent living objectives. Accordingly, on the basis of the totality of the evidence, the court concludes that commitment of this youth to DCF is consistent with her best interests.
The court hereby finds, applying a fair preponderance of the evidence standard of proof[16], the following: (1) at all times (including both before and after the vacating of the OTC), the Department made reasonable and diligent efforts to work with Naomi L. and to eliminate the need for the continued removal of the youth from her parental home; and, (2) a commitment to DCF is in the youth's overall best interests.
The said youth, Naomi L., having been adjudicated an uncared for/specialized needs child, is hereby committed to the Commissioner of the Department of Children and Families for a period running to her eighteenth birthday, after which date she maybe eligible for voluntary services to age twenty-one, provided she meets statutory requirements.[17] cf. General Statutes Section 46b-129 (d). The effective date of this commitment is the date of the filing of this decision, that is, February 23, 1994.
Mulcahy, J.